UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                  :

ROBERT G. LOPEZ,                      :
                                  :

                 Plaintiff,        :

                                  :                19-cv-7631 (LJL)

       -v-                       :

                                  :           OPINION AND ORDER

ADIDAS AMERICA, INC., ET AL.,     :

                                :

               Defendants.   :

                                :
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__5/19/2020__

LEWIS J. LIMAN, United States District Judge:

       Plaintiff Robert G. Lopez ("Lopez" or "Plaintiff"), proceeding *pro se*, has filed a Third

Amended Complaint (the "TAC") against Defendant PUMA North America, Inc. ("PUMA") and

others.  (Dkt. No. 43.)  The TAC alleges claims of trademark infringement (Count I), unfair

competition and false designation of origin (Count II), common law trademark infringement and

unfair competition (Count III), and unjust enrichment (Count IV).  (*Id.*)  Pending before the Court

is PUMA's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  (Dkt. No. 48.)

BACKGROUND[1]

**I.   Factual Background**

       Lopez is a small business owner who operates a clothing business under the trade name

L.E.S. CLOTHING CO.™  (*Id.* ¶ 25.)  He maintains stores in New York and other states, and he

sells his products through a website and on social media platforms.  (*Id.* ¶ 28.)  Lopez alleges that

---

[1] The facts are drawn from Plaintiff's TAC.  *See Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (facts alleged in the complaint are "taken as true" when a court reviews a motion to dismiss under Fed. R. Civ. P. 12(b)(6)).  The Court "construe[s] Plaintiff's *pro se* complaint liberally to raise the strongest arguments that it suggests."  *Costabile v. New York City Health & Hosps. Corp.*, 951 F.3d 77, 80 (2d Cir. 2020).  In this opinion, the Court describes only those allegations in the TAC pertinent to the claim against PUMA.

he has been selling headwear, t-shirts, sweaters, hooded sweatshirts, and other clothing items under the LOWER EAST SIDE™, LES™, and LES NYC® brand names since "at least as early as 1997." (*Id.* ¶ 24.)  Since at least 2010, he has also been selling clothing items under the LOYALTY EQUALS STRENGTH™ mark, which he asserts is an "additional representation of what the LES™ acronym stands for and represents." (*Id.* ¶ 25.)  Plaintiff advertises his brands through flyers, banners, and business cards, as well as through grassroot marketing methods such as painted street murals and photo shoots with customers. (*Id.* ¶¶ 27, 29.)  According to the TAC, Lopez has a social media following of over 20,000 and his clothing items have been endorsed by celebrities. (*Id.* ¶¶ 30, 34.)  Lopez alleges that his products have also appeared in movies and on television shows. (*Id.* ¶ 35.)

PUMA "is a major retailer of apparel products." (*Id.* ¶ 51.)  According to the TAC, PUMA is known for its releases of clothing and footwear products in collaboration with other apparel companies. (*Id.* ¶¶ 51, 53.)  PUMA operates retail stores worldwide and sells its products through its own website and through third-party websites. (*Id.* ¶¶ 51, 52.)

The TAC references a prior dispute that Lopez had with PUMA in a sister court in this District. (*Id.* ¶ 55 (citing *Lopez v. Puma North America, Inc.*, No. 15-cv-8874 (S.D.N.Y. 2016).)  In that case, Lopez alleged that PUMA had released a pair of sneakers with the word "LES" on the left sneaker and the word "NYC" on the right, such that when the sneakers were viewed together, they infringed on his LES NYC® trademark. (*Id.*)  That case was voluntarily dismissed with prejudice before PUMA was served, *see Lopez*, No. 15-cv-08874, Dkt. No. 6, (S.D.N.Y. Jan. 20, 2016), but Lopez alleges that the case "garnered national media attention" and led "[t]housands" of his "long-standing customers" to believe that PUMA's sneakers were done as a collaboration between his brand and PUMA. (Dkt. No. 43 ¶¶ 56, 57.)

The current lawsuit arises from PUMA's collaboration with an Istanbul-based designer called Les Benjamins.  (Dkt. No. 52 at 1.)  In 2019, Lopez "started getting calls and other forms of communications . . . from long-standing customers . . . inquiring about the latest clothing and sneaker release from PUMA," which was "advertised and sold under the name PUMA x LES BENJAMINS."  (Dkt. No. 43 ¶ 58.)  Specifically, "Plaintiff's customers were looking to purchase," "directly from Plaintiff," "the hoodies and sneakers advertised and sold by Defendant PUMA[.]"  (*Id.*)  According to the TAC, these customers "believ[ed] that the hoodies, sneakers and other clothing items advertised and offered for sale by Defendant PUMA under the name PUMA x LES BENJAMINS were released as a collaboration with Plaintiff and his L.E.S. Clothing Co.™ company."  (*Id.*)

The TAC asserts that "Defendant PUMA is using in commerce without consent[] Plaintiff's LES NYC® trademark and/or a confusingly similar variation of the same mark[.]"  (*Id.* ¶ 59.)  Specifically, the TAC alleges that PUMA "places the LES BENJAMINS mark," which "is a confusingly similar variation of Plaintiff's LES NYC® mark," on clothing items such as "t-shifts, hoodies, jackets, beanies and sneakers" and then sells those items on PUMA's website, on other websites, and in retail clothing stores.  (*Id.*)  The TAC includes photographs of allegedly infringing PUMA products including sneakers, a hoodie, and a beanie.  (*Id.* at 19–21.)

The TAC further alleges that PUMA's promotion of the collection as "PUMA x LES BENJAMINS" "falsely promotes an association with Plaintiff and his LES NYC® and LES™ collection of brand names and causes a likelihood confusion between the source of the products offered by Defendant PUMA and Plaintiff."  (*Id.* ¶ 63.)

Lopez characterizes his LES NYC® mark as "federally registered."  (*Id.* ¶ 65.)

## II.   Procedural Background

Plaintiff filed his first Complaint on August 15, 2019.  (Dkt. No. 1.)  The case was assigned

to the Honorable Judge Schofield.  On October 25, 2019, Lopez filed a Second Amended

Complaint.  (Dkt. No. 15.)  On November 19, 2019, PUMA filed a letter-motion requesting

permission to file a motion to dismiss the Second Amended Complaint.  (Dkt. No. 16.)  The Court

advised that the letter-motion would be discussed at a forthcoming conference.  (Dkt. No. 18.)  On

December 10, 2019, Lopez requested permission to file a Third Amended Complaint.  (Dkt. No.

37.)  The letter stated:

> It was recently brought to my attention . . . that Plaintiff's Second Amended
> Complaint completely omitted all of the claims and allegations against Infinity 1
> that were contained in Plaintiff's First Amended Complaint.  This was . . .
> unintentional error[.][2]
>
> Additionally, upon Plaintiff's further investigation into the unauthorized use of his
> trademarks by Defendant Puma, Plaintiff has uncovered additional business entities
> that act as distributors and retailers of the infringing products offered by Defendant
> Puma and Plaintiff would like to properly name these additional infringing parties
> as a Defendant [sic] to the current action.
>
> In view of the above, Plaintiff is respectfully requesting permission from Your
> Honor to file a Third Amended Complaint in this action.

(*Id.*)  A conference was held on December 17, 2019.  (*See* Dkt. No. 41.)  No transcript of it appears

on the docket.  However, on the day following the conference, the Court issued the following

order:

> Plaintiff shall file the Third Amended Complaint ("TAC") by **January 3, 2020**. The
> TAC shall not include: (1) Defendant Barneys New York, Inc. which has filed for
> bankruptcy or (2) retailer or distributor defendants. It is further
>
> **ORDERED** that Defendant Puma North America, Inc.'s Motion to Dismiss is due
> **January 8, 2020**, and will be construed as applying to the TAC.

---

[2] The claims against Infinity 1 related to alleged breach of a 2017 settlement agreement and are not relevant to those
against PUMA.  (Dkt. No. 43 ¶ 214.)  Plaintiff dismissed his claims against Infinity 1 on January 22, 2020.  (Dkt. No.
64.)

(*Id.*)  Lopez filed the TAC on December 30, 2019.  (Dkt. No. 43.)

On January 2, 2020, PUMA requested a one-week extension of the deadline to file its Motion to Dismiss "in light of Plaintiff Robert Lopez filing a Third Amended Complaint [Dkt. No. 43] with radically different allegations against Puma than those contained in the Second Amended Complaint."  (Dkt. No. 44.)  The letter specified that PUMA "reserve[d] the right to address the unlawfulness of these amendments" but that it nevertheless intended to file a motion to dismiss addressing those new allegations.  (*Id.*)  The Court granted PUMA's request for extension and, pursuant to that order (Dkt. No. 45), PUMA timely filed its Motion to Dismiss on January 15, 2020 (Dkt. No. 48).  Two weeks later, Lopez filed a response (Dkt. No. 68).  On February 4, 2020, the case was reassigned to the undersigned.  PUMA filed a reply on February 10, 2020. (Dkt. No. 72.)

## STANDARD OF REVIEW

In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court "accept[s] all factual allegations as true, and draw[s] all reasonable inferences in the plaintiff's favor."  *Austin v. Town of Farmington*, 826 F.3d 622, 625 (2d Cir. 2016).  Defendant's motion must be granted unless the TAC includes "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Likewise, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).  The ultimate question is whether "[a] claim has facial plausibility."  *Id.*  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

5

As noted above, the Court "construe[s] Plaintiff's *pro se* complaint liberally to raise the strongest arguments that it suggests." *Costabile*, 951 F.3d at 80.

## DISCUSSION

I.    **Whether to Strike References to 2015 Litigation Against PUMA**

Paragraphs 54–57 of the TAC reference Lopez's voluntarily dismissed 2015 case against PUMA, *Lopez v. Puma North America, Inc*., No. 15-cv-8874 (S.D.N.Y. 2016). PUMA gives two reasons why the Court should disregard those paragraphs: first, because Lopez lacked permission to add them, and second, because the allegations in them are improper as a matter of law.

With regard to the first issue—the scope of Lopez's leave to amend—Lopez asserts that it is "his understanding" that "the purpose of filing an amended complaint is to make changes, edits, corrections and amendments to the claims and/or allegations[.]" (Dkt. No. 68 at 2.) He read the Court's December 18, 2019 Order to "**NOT** place any limitations on the drafting of Plaintiff's Third Amended Complaint other than[:] **'The TAC shall not include: (1) Defendant Barneys New York, Inc. which has filed for bankruptcy or (2) retailer o[r] distributor defendants[,]'** in relation to Defendant PUMA." (*Id*. (quoting Dkt. No. 41).)

"[D]istrict judges should, as a general matter, liberally permit pro se litigants to amend their pleadings." *Terry v. Inc. Vill. of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016). Still, "[t]he Second Circuit has recognized that '[d]istrict courts in this Circuit have routinely dismissed claims in amended complaints where the court granted leave to amend for a limited purpose and the plaintiff filed an amended complaint exceeding the scope of the permission granted.'" *Thind v. HF Mgmt. Servs., LLC*, 2017 WL 6311691, at *2 (S.D.N.Y. Dec. 8, 2017) (quoting *Palm Beach Strategic Income, LP v. Salzman*, 457 F. App'x. 40, 43 (2d Cir. 2012)). "The power to dismiss claims that exceed a leave to amend stems from the Court's inherent authority." *Bravo v.*

*Established Burger One, LLC*, 2013 WL 5549495, at *5 (S.D.N.Y. Oct. 8, 2013).  But, in appropriate cases, a district court need not exercise that authority.  *See, e.g.*, *Thind*, 2017 WL 6311691, at *4 ("To the extent that the Complaint exceeds the scope of the Court's leave to amend by including the challenged allegations, the transgression is minor and the Court will not dismiss on this ground."); *Azkour v. Bowery Residents' Comm., Inc*., 2017 WL 4329629, at *3 (S.D.N.Y. Sept. 13, 2017) ("[B]ecause plaintiff is a *pro se* litigant, the Court declines to strike outright the improperly amended portions of his First Amended Complaint.").

The Court declines to strike Lopez's added allegations on the grounds that they exceeded the scope of his leave to amend.  Not only is Lopez entitled to "special solicitude" as a *pro se* litigant, *see, e.g.*, *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), but his reading of the December 18, 2019 amendment order is at least reasonable, if not superior to PUMA's.

PUMA next argues that the Court should dismiss Lopez's allegations about the 2015 litigation because such allegations would not be admissible in support of any claim or defense. The TAC states that Lopez "commenced" the 2015 litigation (Dkt. No. 43 ¶ 55), that Lopez made certain allegations therein (*id.* ¶¶ 54–55), and that the litigation "garnered national media attention" (*id.* ¶ 56).  The Court is mindful that "paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f)," but does not find that to be a basis for striking Paragraphs 54–57.  *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009).  As will be discussed more below, the Court may "properly consider 'matters of which judicial notice may be taken.'"  *Halebian v. Berv*, 644 F.3d 122, 131 n.7 (2d Cir. 2011) (quoting *Chambers v. Time Warner, Inc*., 282 F.3d 147, 153 (2d Cir. 2002)).  "[I]t is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained

certain information, without regard to the truth of their contents." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).  The Court does so here.  Without accepting the truth of the underlying allegations from the 2015 litigation, the Court may take notice that such allegations were made.[3]  PUMA's request for the Court to strike Paragraphs 54–57 is denied.

## II.   Trademark Infringement

### A.  Registered Trademark (Count I)

Count 1 of the TAC alleges that PUMA's use of LES BENJAMINS in its PUMA x LES BENJAMINS apparel line is identical or confusingly similar to Plaintiff's LES NYC® registered trademark and is likely to cause confusion, mistake and deception among members of the public and in trade as to the source, origin, or sponsorship of Defendant's goods in violation of the Lanham Act.  (Dkt. No. 43 ¶ 198.)  PUMA counters that Plaintiff's allegations, even if taken as true and construed generously as they must be, fail to allege that PUMA used the LES NYC® mark or a confusingly similar one.

Under 15 U.S.C. § 1114(1)(a):

> Any person who shall, without the consent of the registrant . . . use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant[.]

"In addition, the plaintiff must show that defendant's use of that mark 'is likely to cause confusion . . . as to the affiliation, connection, or association of [defendant] with [plaintiff], or as to the origin, sponsorship, or approval of [the defendant's] goods, services, or commercial activities by [plaintiff].'" *1-800 Contacts, Inc. v. WhenU.Com, Inc*., 414 F.3d 400, 407 (2d Cir. 2005) (quoting

---

[3] To the extent those paragraphs invite the Court to reason that actual confusion occurred regarding the PUMA x LES BENJAMINS line because actual confusion occurred over the "LES" "NYC" line of PUMA sneakers, the Court will not make that inference.

15 U.S.C. § 1125(a)(1)(A)).  "Not only are 'use,' 'in commerce,' and 'likelihood of confusion'

three distinct elements of a trademark infringement claim, but 'use' must be decided as a threshold

matter because, while any number of activities may be 'in commerce' or create a likelihood of

confusion, no such activity is actionable under the Lanham Act absent the 'use' of a trademark."

*Id.* at 412.  The Lanham Act defines "use in commerce," in relevant part, as follows:

> For purposes of this Chapter, a mark shall be deemed to be in use in commerce—
>
> (1) on goods when—
>
> (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto . . . and
>
> (B) the goods are sold or transported in commerce[.]

15 U.S.C. § 1127.

The TAC does not allege that PUMA is infringing the LES NYC® mark by using the exact

words "LES NYC."  Rather, it alleges that PUMA is infringing the LES NYC® mark by using the

language "LES BENJAMINS" as part of the PUMA x LES BENJAMINS mark.  PUMA argues

that, accordingly, the TAC fails to state a claim that PUMA is "using" Lopez's mark.

PUMA's position finds no support in the statutory text or the caselaw.  It would lead to the

absurd outcome that a defendant could only be liable under Section 1114(1)(a) if the defendant

used the exact same, *verbatim*, mark that the plaintiff had registered.  But it is black-letter

trademark law that infringement may be found when marks "are different."[4]  *Polaroid Corp. v.*

*Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).  That premise informs the entire

"likelihood of confusion" doctrine that has become central to resolution of these cases.  PUMA's

position would render obsolete at least one of the "likelihood of confusion" factors: similarity

---

[4] Indeed, for over 150 years, it has been the case that "colorable imitations" may "form infringements upon the jus in rem of a trade-mark."  *Washington Medalion Pen Co. v. Esterbrook*, 29 F. Cas. 366 (S.D.N.Y. 1869).

between two marks.  *See id.*  Plainly, PUMA is "plac[ing]" "a mark" on "goods" and those "goods are sold or transported in commerce."  *1-800 Contacts, Inc.*, 414 F.3d at 407 (quoting 15 U.S.C. § 1127).

The question that remains is whether PUMA's use of that mark "is likely to cause confusion . . . as to the affiliation, connection, or association of [PUMA] with [Lopez], or as to the origin, sponsorship, or approval of [PUMA's] goods, services, or commercial activities by [Lopez].'"  *1-800 Contacts, Inc.*, 414 F.3d at 407.  "To support a finding of infringement, a probability of confusion, not a mere possibility, must exist."  *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998).  In addressing that probability, the Court relies on the non-exclusive multifactor test (sometimes called the "*Polaroid* factors") originating from Judge Friendly's celebrated opinion in *Polaroid Corp.*, 287 F.2d at 492.  Those factors, applied to this case, are:[5]

> (1) the strength of Lopez's mark;
> (2) the similarity of the parties' marks;
> (3) the proximity of the parties' areas of commerce;
> (4) the likelihood that Lopez will bridge the gap separating their areas of activity;
> (5) the existence of actual consumer confusion;
> (6) whether PUMA acted in bad faith or was otherwise reprehensible in adopting the mark;
> (7) the quality of the PUMA's product; and
> (8) the sophistication of the relevant consumer group.

*See Guthrie Healthcare Sys. v. ContextMedia, Inc*., 826 F.3d 27, 37 (2d Cir. 2016) (citing *Polaroid Corp*., 287 F.2d at 495).  "The application of the *Polaroid* test is 'not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused.'"  *Starbucks Corp. v. Wolfe's Borough Coffee, Inc*., 588 F.3d 97, 115 (2d Cir. 2009) (quoting *Star Indus., Inc. v. Bacardi & Co*., 412 F.3d 373, 384 (2d Cir. 2005)).

---

[5] PUMA does not dispute that Lopez has federally registered the LES NYC® mark. (Dkt. No. 52 at 11.)

1. *Polaroid* **Factors at the Motion to Dismiss Stage**

"Normally, the likelihood of confusion is a factual question, centering on the probable reactions of prospective purchasers of the parties' goods." *Pirone v. MacMillan, Inc*., 894 F.2d 579, 584 (2d Cir. 1990). "Claims, however, may be dismissed as a matter of law where 'the court is satisfied that the products or marks are so dissimilar that no question of fact is presented.'" *Id.* (quoting *Universal City Studios, Inc. v. Nintendo Co. Ltd*., 746 F.2d 112, 116 (2d Cir. 1984)).

"It is well established that a pleading is deemed to include any 'written instrument' that is attached to it as 'an exhibit' or is incorporated in it by reference." *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020) (quoting Fed. R. Civ. P. 10(c)). Furthermore, without converting a motion to dismiss into one for summary judgment, courts may consider documents that are "'integral' to the complaint," even where those documents have not been attached as an exhibit or incorporated by reference. *Chambers*, 282 F.3d at 153 (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co*., 62 F.3d 69, 72 (2d Cir. 1995)). A document is "integral to the complaint" if the complaint "relies heavily upon its terms and effect." *Id.* (quoting *Int'l Audiotext Network, Inc.*, 62 F.3d at 72); *Palin v. New York Times Co*., 940 F.3d 804, 811 (2d Cir. 2019) ("A matter is deemed 'integral' to the complaint when the complaint 'relies heavily upon its terms and effect.'") (quoting *Chambers*, 282 F.3d at 153).

Additionally, without converting a motion to dismiss into a motion for summary judgment, courts may "properly consider 'matters of which judicial notice may be taken.'" *Halebian*, 644 F.3d at 131 n.7 (quoting *Chambers*, 282 F.3d at 153); *see also Staehr*, 547 F.3d at 426 ("[M]atters judicially noticed by the District Court are not considered matters outside the pleadings.") (citing 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1366 & n. 33 (3d ed. 2004) ("[M]atters of which the district court can take judicial notice" are "not considered matters outside the

pleadings for purposes of conversion.")).  Under Federal Rule of Evidence 201, "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  The Second Circuit endorses taking judicial notice of trademark registrations.  *See Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005) (taking judicial notice of federal copyright registrations and citing to an Eighth Circuit case taking judicial notice of trademark registrations).

On April 2, 2020, the Court issued an order explaining that it intended to consider certain matters raised by PUMA's motion to dismiss, which were outside the TAC, because the Court considered those matters to be incorporated by reference into the TAC, "integral" to the TAC, or subject to judicial notice.  (Dkt. No. 88.)[6]  The order explained that, to the extent the TAC raised any material outside the TAC other than the identified matters, the Court would "exclude the additional material" when considering the motion.  (*Id.* (quoting *Palin*, 940 F.3d at 810–11)).  The order invited any party desiring oral argument on the motion to dismiss or disputing the Court's power to consider the identified materials (or disputing the authenticity or accuracy of such material) to inform the Court by May 4, 2020.  (*Id.*)[7]  "In the absence of objection," the order

---

[6] Those matters were: "Les Benjamins is an independently registered trademark that PUMA uses in connection with its collaboration" (subject to judicial notice); "On PUMA's website and clothing in the collection, PUMA references 'PUMA X LES BENJAMINS'" (integral to the TAC); "Lopez's trademark approves the mark as distinctive only as to the whole LES NYC® mark, not to any portion thereof" (subject to judicial notice); "As used by PUMA, the word 'LES' refers to the French article that translates to the English word 'the'" (subject to judicial notice); "Lopez's New York trademark registration is for the LES™ mark in a particular design" (subject to judicial notice); "Lopez has filed over 35 intellectual property actions against over 100 parties in the Southern District of New York alone" (subject to judicial notice).  (*See* Dkt. No. 88.)  The Court also inquired whether either party wanted the Court to receive and review physical copies of the allegedly infringing and infringed items.  (*Id.*)  Neither party accepted the Court's invitation.

[7] As explained in the April 2, 2020 order, the Court had scheduled telephonic oral argument on the motion to dismiss for April 1, 2020. (Dkt. No. 88.) Plaintiff was given notice of the oral argument by "a copy of the order mailed to him at the address he provided for the Court," "two emails" from PUMA's counsel, and a phone call from chambers. (*Id.*) Plaintiff did not appear at the appointed time and, therefore, the Court terminated the conference without argument. (*Id.*)

advised, the Court would "decide the motion without argument and considering the foregoing

materials as incorporated by reference, integral to the complaint, or the subject of judicial notice."

(*Id.*)  No objection was received.

### 2. *Polaroid* Factors Analyzed

As stated above, the *Polaroid* factors as applied to this case are:

> (1) the strength of Lopez's mark;
> (2) the similarity of the parties' marks;
> (3) the proximity of the parties' areas of commerce;
> (4) the likelihood that Lopez will bridge the gap separating their areas of activity;
> (5) the existence of actual consumer confusion;
> (6) whether PUMA in bad faith or was otherwise reprehensible in adopting the mark;
> (7) the quality of the PUMA's product; and
> (8) the sophistication of the relevant consumer group.

*See Guthrie*, 826 F.3d at 37 (citing *Polaroid Corp.*, 287 F.2d at 495).

The Court addresses each in turn.

### a)  The strength of Lopez's mark

This inquiry "focuses on the distinctiveness of the mark, or more precisely, its tendency to

identify the goods as coming from a particular source." *Lang v. Ret. Living Pub. Co.*, 949 F.2d

576, 581 (2d Cir. 1991) (internal quotation marks and citation omitted); *see also Star Indus., Inc.*,

412 F.3d at 384 ("The strength of a mark is determined by its tendency to uniquely identify the

source of the product.").  "To gauge a mark's strength," courts "consider two factors: its inherent

distinctiveness, and its distinctiveness in the marketplace." *Streetwise Maps, Inc.*, 159 F.3d at 744.

"Discussing the former first, courts classify a mark in one of four categories in increasing

order of inherent distinctiveness: generic, descriptive, suggestive, and arbitrary." *Id.*  "Generic

marks are those consisting of words identifying the relevant category of goods or services. They

are not at all distinctive and thus are not protectable under any circumstances." *Star Indus., Inc.*,

412 F.3d at 385.  "Descriptive marks are those consisting of words identifying qualities of the

product. They are not inherently distinctive, but are protectable provided they have acquired secondary meaning, which we sometimes refer to as acquired distinctiveness." *Id.* (internal quotation marks and citation omitted). "Suggestive marks and arbitrary or fanciful marks are each inherently distinctive." *Id.* "To address distinctiveness in the marketplace, a court looks to factors 'such as third-party use of similar marks, duration of use, and sales volume.'" *Hypnotic Hats, Ltd. v. Wintermantel Enterprises, LLC*, 335 F. Supp. 3d 566, 583 (S.D.N.Y. 2018) (quoting *Nature's Best, Inc. v. Ultimate Nutrition, Inc*., 323 F.Supp.2d 429, 432 (E.D.N.Y. 2004)).

The LES NYC® mark plainly references the Lower East Side neighborhood of Manhattan. "Geographic terms are not inherently distinctive." *Lopez v. Gap, Inc*., 883 F. Supp. 2d 400, 415 (S.D.N.Y. 2012) (citing *Greenpoint Fin. Corp. v. Sperry & Hutchinson Co*., 116 F.Supp.2d 405, 409 (S.D.N.Y. 2000)). "Since geographically descriptive terms are not inherently distinctive, they can be protected as trademarks only upon proof that through usage, they have become distinctive." 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 14:1 (5th ed. 2020). "Such an acquisition of distinctiveness is referred to as 'secondary meaning.'" *Id.* Lopez argues that his LES NYC® mark has acquired "secondary meaning." (Dkt. No. 43 ¶ 31.)

It is important to this analysis that Lopez has an "incontestable" registered trademark. "A registered mark becomes incontestable if it has been in continuous use for five consecutive years subsequent to its registration and is still in use." *Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp*., 991 F.2d 1072, 1076 (2d Cir. 1993). The LES NYC® trademark was registered on June 17, 2014 and Lopez alleges that he has engaged in "continuous and long-standing use of the mark[] in the apparel industry for nearly twenty (20) years." (Dkt. No. 43 ¶ 31, Exhibit C.) "If a mark [becomes] incontestable, its registration 'shall be conclusive evidence . . . of the registrant's exclusive right to use the registered mark in commerce,'

14

subject to defenses not here relevant." *Gruner + Jahr USA Pub.*, 991 F.2d at 1076 (quoting 15 U.S.C. § 1115(b)). "What this means is that a defendant in an infringement suit—where plaintiff has an incontestable mark because of five years' registration—may not succeed in a defense that declares the mark is entitled to no protection because it is descriptive." *Id.* at 1077.

Sensibly, PUMA does not argue that LES NYC® is unentitled to trademark protection. Rather, PUMA contends that the incontestably registered descriptive mark is weak. PUMA cites *Gruner + Jahr USA Pub.* for the proposition that "even where a mark has acquired strength on its own[,] 'the strength of an incontestable registered trademark could be overcome by the use of a descriptive or weak portion of the mark.'" (Dkt. No. 52 at 16 (citing *Gruner + Jahr USA Pub.*, 991 F.2d at 1077).) Indeed, it is well-established that the Court should look "beyond the incontestability of the mark" because "independent indicia of strength [are] relevant to deciding whether the strength of the mark weighs in favor or against a finding of likelihood of confusion under *Polaroid*." *The Sports Authority, Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 961 (2d Cir. 1996).

In *Gruner + Jahr USA Pub.*, the affirmed district court had "found that the mark PARENTS was strong [for purposes of protectability] since it was an incontestable registered trademark, having necessarily acquired secondary meaning." 991 F.2d at 1077. But the district court also found that "the mere word parents could be considered weak." *Id.* (internal quotation marks omitted). These findings were deemed "not . . . inconsistent." *Id.* "[T]he trademark registration of the title PARENTS in its distinctive typeface did not confer an exclusive right to plaintiff on variations of the word 'parent,' such term being more generic than descriptive," the court reasoned. *Id.* The court explained that "[t]he fact that the term 'parents' resides in the public domain . . . lessens the possibility that a purchaser would be confused and think the mark came

from a particular single source."  *Id.* at 1078 (citing *Lang*, 949 F.2d at 581 (extensive third-party use of term "choice" weakens mark)).

In *The Sports Authority, Inc*., the Second Circuit distinguished *Gruner + Jahr USA Pub.* in part on the basis that, in the latter, the "trademark consisted of a stylized logo of the word 'parents'" whereas The Sports Authority's trademark was "for the words 'The Sports Authority' without any logo."  89 F.3d at 961 (citing *Gruner + Jahr USA Pub.*, 991 F.2d at 1078).  "Thus," *The Sports Authority, Inc*. reasoned, "in this case, the registration does not just protect the logo but the words as well, and a trier of fact could reasonably conclude that [The Sports Authority's] word mark, having been incontestable for five years, [was] strong for the purposes of the *Polaroid* test." *Id.*  It is worth noting that Lopez's registration protects LES NYC® "without claim to any particular font, style, size, or color."  (Dkt. No. 43, Exhibit C.)  In that sense, the mark is closer to *The Sports Authority, Inc*. than to *Gruner + Jahr USA Pub.  But see Streetwise Maps, Inc*., 159 F.3d 739, 744 (noting "extensive use of the *words* 'street' and 'wise' in names registered by manufacturers of other products"—without mentioning any design—and concluding that the district court clearly erred in finding that the mark "Streetwise" was "relatively strong," even though it was a "suggestive" mark).  Furthermore, the strength of any mark is a unique and "fact-intensive inquiry."  *Citigroup Inc. v. AT&T Servs., Inc*., 2016 WL 4362206, at *7 (S.D.N.Y. Aug. 11, 2016).  It is the case here that LES and NYC are each geographic terms.  Together, they form another geographic term.  That suggests weakness.

Ultimately, without any evidence yet in the record of the factors used to demonstrate secondary meaning—"(1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) unsolicited media coverage of the product; (4) sales success; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use"—the Court cannot say definitively

that the mark is weak.  *Gap, Inc.*, 883 F. Supp. 2d at 425.  The fact that the mark is incontestably registered and that Lopez has raised some allegations supporting strength under these criteria suffices for the moment.  This factor favors Lopez and does not support dismissal.

### b)  The similarity of the parties' marks

When analyzing this factor, "courts appraise 'the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers.'"  *Streetwise Maps, Inc.*, 159 F.3d at 744 (quoting *Gruner + Jahr*, 991 F.2d at 1078).  PUMA is correct that there is precedent for dismissing a trademark infringement claim at the motion to dismiss stage based on this factor.  *See Le Book Pub., Inc. v. Black Book Photography, Inc.*, 418 F. Supp. 2d 305, 311 (S.D.N.Y. 2005) (concluding that "the 'degree of similarity' element . . . overwhelms any possibility of confusion").  PUMA is also correct that courts have dismissed trademark infringement claims where the only similarity was a common word or phrase.  *See, e.g.*, *id.*; *E.A. Sween Co., Inc. v. A & M Deli Express Inc.*, 787 F. App'x 780, 784 (2d Cir. 2019).

PUMA insists that Lopez does not allege that the marks are similar in font, color, or size, and that the images relied on by Lopez do not suggest such similarities.  The Court slightly disagrees.  The side-by-side image comparison of the products makes clear that both presentations use all-caps lettering and simplistic font.  (Dkt. No. 52 at 16.)  In both presentations, the marks are the primary focus (and only textual content) on the products.  There are some visual similarities.

That said, the phrase "LES NYC" is plainly dissimilar from the phrase "LES BENJAMINS."  One conjures to mind a geographic location.  The other conveys a foreign-language plural noun.  Those are entirely distinct concepts.  To be sure, the phrases have one word ("LES") in common.  But any reasonable consumer would know that the word means completely

17

different things in context of each phrase. In one phrase, the word "LES" means a neighborhood—the *L*ower *E*ast *S*ide. In the other, it means a French plural article. Furthermore, in "LES NYC," the word "LES" is an abbreviation that is pronounced as the sequence of each initial letter: "Ell, Eee, Ess." In the other, it is pronounced as a single word: "Lez." It is also worth noting that PUMA uniformly used "LES BENJAMINS" in the context of the yet fuller and more distinct phrase "PUMA x LES BENJAMINS."

This factor cuts strongly in PUMA's favor.

### c)  The proximity of the parties' areas of commerce

"This factor considers whether the two products compete in the same market." *Streetwise Maps, Inc.*, 159 F.3d at 745. This factor breaks in Lopez's favor. The parties both operate in the fashion and apparel arena. Both parties also operate online and in physical stores.

### d)  The likelihood that Lopez will bridge the gap separating their areas of activity

"Bridging the gap refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *Star Indus.*, 412 F.3d at 387 (internal quotation marks and citation omitted). "The plaintiff's intention to bridge the gap 'helps to establish a future likelihood of confusion as to source.'" *Educ. Testing Serv. v. Touchstone Applied Sci. Assocs., Inc.*, 739 F. Supp. 847, 852 (S.D.N.Y. 1990) (quoting *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 874 (2d Cir. 1986)).

There are no allegations in the TAC supporting gap-bridging. That favors PUMA.

### e)  The existence of actual consumer confusion

"[E]vidence of *actual* consumer confusion is particularly relevant to a trademark infringement action." *Streetwise Maps, Inc.*, 159 F.3d at 745. The TAC does allege some actual confusion, but given the importance of actual confusion to the likelihood-of-confusion analysis, it

is incumbent on the Court to examine in detail what is alleged.  Specifically, the TAC states that, on or about "June of 2019, Plaintiff started getting calls and other forms of communications including emails and direct messages on Instagram from long-standing customers . . . inquiring about the latest clothing and sneaker release from PUMA."  (Dkt. No. 43 ¶ 58.)  According to the TAC, those customers were "looking to purchase the hoodies and sneakers advertised and sold by Defendant PUMA bearing the LES BENJAMINS name directly from Plaintiff . . . ."  (*Id.*)  The TAC explains that the customers believed that the PUMA products "were released as a collaboration with Plaintiff."  (*Id.*)  Those allegations, of course, must be taken as true.

"For purposes of the Lanham Act, actual confusion means consumer confusion that enables a seller to pass off his goods as the goods of another."  *The Sports Authority, Inc.*, 89 F.3d at 963 (internal quotation marks and citation omitted).  "To show actual confusion," a plaintiff "must demonstrate that [the alleged infringer's] use 'could inflict commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation.'"  *Id.* (quoting *Lang*, 949 F.2d at 583).  Lopez does not allege that customers were actually misled into purchasing PUMA products from PUMA because they were thought to be Lopez's products.  The confused customers were looking to make purchases *from Lopez alone*—not from PUMA—and *because of Lopez's perceived affiliation with the products.*  In other words, Lopez does not allege "diversion of sales" from Lopez to PUMA.  *Id.*  If anything, he alleges that customers were driven to him by PUMA's advertising.

Neither does Lopez allege "damage to goodwill."  *Id.*  Lopez states that some of his "long-standing customers" believed that the LES BENJAMINS line was associated with LES NYC® but not that his customers were in any way deterred from their long-standing loyalty to Lopez by that

misunderstanding.  (Dkt. No 43 ¶ 58.)[8]  To the contrary, those customers were (according to the TAC) looking to purchase a collaborative product between Lopez and PUMA—from Lopez.

What remains is "loss of control."  *The Sports Authority, Inc*., 89 F.3d at 963.  In *The Sports Authority, Inc.*, the Second Circuit deemed "cognizable under the Lanham Act" a claim that a junior user's use "[would] lead consumers to be confused as to whether [the senior user] sponsors [the junior user's] activities, with a resulting loss of control by [the senior user] over how the public perceives [the senior user's products]."  *Id.* at 964.  But in *Gruner + Jahr USA Pub*., the Second Circuit had previously determined that it was proper for the trial court to have concluded that evidence of inquiries to the senior user about a "possible relationship between [its publication and the junior user's publication] was "not . . . evidence of actual confusion, but rather [of] only queries into the possible relationship between the parties' publications."  991 F.2d at 1079.

Construing "Plaintiff's *pro se* complaint liberally to raise the strongest arguments that it suggests," *Costabile*, 951 F.3d at 80, it can be read to suggest the "loss of control" form of actual confusion  By stating that customers believed at least for some period of time (before contacting Lopez) that Lopez might have contributed to PUMA's products, it could be said that Lopez lost some control over the public's perception of Lopez and thereby, potentially, his product.

Cognizable though that argument may be as a general matter, this Court must fit it into the *Polaroid* analysis by determining how strongly it supports Lopez's claim that PUMA's use of PUMA x LES BENJAMIN creates a likelihood of confusion with Lopez's use of LES NYC®. The Court's answer is: not very strongly.  Loss of control is not an all-or-nothing, have-it-or-lack-it proposition.  There are degrees of control.  One might imagine a case where long-standing customers believed that the PUMA x LES BENJAMINS line was entirely Lopez's creation.  Those

---

[8] As noted below, Lopez never asserts that PUMA has a low-quality product such that customers might be off-put by Lopez's affiliation with PUMA.

customers would attribute every aspect and detail of those products to Lopez.  Lopez would be
responsible, in their minds, for every strength and every flaw—Lopez having had, in fact, no
control over them.  That is not this case.  Here, construing the TAC liberally, certain customers
allegedly believed that Lopez had a relationship with PUMA in the manufacture or marketing of
the PUMA x LES BENJAMINS line and, accordingly, that Lopez as an individual contributed to
the strength or weakness of that allegedly collaborative product.  That perception, assumed to be
true for purposes of this motion, would have only a remote relationship to the public's perception
of Lopez's independently manufactured and marketed products and have only an attenuated
impact, if any, on Lopez's control of the mark LES NYC® for products that Lopez alone created.
Put another way, PUMA's use of PUMA x LES BENJAMINS would not have created the
perception that Lopez was responsible for every strength and every flaw in the PUMA x LES
BENJAMINS line or that products bearing the LES NYC® mark would share any of those
strengths or flaws because, accepting the TAC's allegations, the customers understood that PUMA
had responsibility for the PUMA x LES BENJAMINS line and Lopez himself did not control that
mark.

Indeed, some courts have held that evidence "about customers' enquiries to plaintiff as to
whether plaintiff and defendant are affiliated or connected . . . reveals that the questioner had the
difference in mind or else would not have bothered even to enquire."  2 J. Thomas McCarthy,
*McCarthy on Trademarks & Unfair Competition* § 23:16 (5th ed. 2020) (collecting cases).  That
seems particularly applicable here.  Although the TAC alleges that customers contacted Lopez
"attempt[ing] to purchase" PUMA x LES BENJAMINS products from Lopez, allegations
elsewhere in the TAC and facts judicially noticed undercut that claim.  (Dkt. No. 43 ¶ 68.)  If the
customers wanted to purchase the products that were thought to be collaborative, they could have

simply done so from PUMA's website or stores.  It is alleged that PUMA—*not Lopez*—advertised and marketed the PUMA x LES BENJAMINS line.  (*Id.* ¶ 63.)  Because Lopez was not himself advertising the products or offering them for sale, it stands to reason that these customers primarily had curiosity about the relationship—not actual confusion about product source—in mind. Curiosity Lopez himself put to rest.

All told, although Lopez has (barely) alleged actual confusion, it counts in his favor only weakly.

### f)   Whether PUMA in bad faith or was otherwise reprehensible in adopting the mark[9]

"This factor looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product."  *Lang*, 949 F.2d at 583 (internal quotation marks and citation omitted).  "Prior knowledge of a senior user's mark does not, without more, create an inference of bad faith." *Playtex Prod., Inc. v. Georgia-Pac. Corp.*, 390 F.3d 158, 166 (2d Cir. 2004), *superseded by statute on other grounds*, 15 U.S.C. § 1125(c)(2)(B).  For this factor, Lopez relies on his 2015 case against PUMA and on the conclusory allegation that "PUMA has acted in bad faith . . . as it has attempted to palm off the good will and reputation that Plaintiff has built[.]"  (Dkt. No. 43 ¶ 74.)  The TAC does not make particularized, plausible allegations that PUMA (a global brand, in the course of an international collaboration) sought to capitalize off Lopez's brand.  This factor counts in favor of PUMA.

---

[9] It is worth noting that the Second Circuit has held that neither "the existence of bad faith on the part of the secondary user" nor "the quality of the secondary user's products or services" is "of high relevance to the issue of likelihood of confusion." *Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 151 (2d Cir. 2003)

### g)  The quality of PUMA's product

"The issue of the quality of the secondary user's product goes more to the harm that confusion can cause the plaintiff's mark and reputation than to the likelihood of confusion." *Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 152 (2d Cir. 2003); *see also Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 398 (2d Cir. 1995) ("This factor is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality.").  The allegations in the TAC, if anything, suggest that PUMA has a high-quality product.  Lopez states that PUMA is a "major" retailer that "has flagship retail clothing stores worldwide."  (Dkt. No. 43 ¶ 51.)  Admittedly, it could be argued that those allegations speak more to PUMA's popularity than to the quality of its product.  Even so, Plaintiff nowhere in the TAC suggests that PUMA has a low-quality product.  This factor counts in PUMA's favor.

### h)  The sophistication of the relevant consumer group

"[R]etail customers . . . are not expected to exercise the same degree of care as professional buyers, who are expected to have greater powers of discrimination."  *Nawab*, 335 F.3d at 151 (internal quotation marks omitted); *see also E.A. Sween Co., Inc.*, 787 F. App'x at 785 ("[I]t can be inferred that retail consumers . . . [are] not as sophisticated as other types of purchasers.").  The Court need not and does not hold a finding of non-sophistication is required in every retail case.  Here, however, there are no allegations in the TAC, or points made in the motion to dismiss, to suggest that Lopez's customers are sophisticated.  Therefore, this factor counts in favor of Lopez.

### i)  Summary

Based on the analysis above, the factors resolve as follows.

**(1) The strength of Lopez's mark:** For Lopez
**(2) The similarity of the parties' marks:** For PUMA

**(3) The proximity of the parties' areas of commerce:** For Lopez

**(4) The likelihood that Lopez will bridge the gap separating their areas of activity:** For PUMA

**(5) The existence of actual consumer confusion:** For Lopez

**(6) Whether PUMA in bad faith or was otherwise reprehensible in adopting the mark:** For PUMA

**(7) The quality of the PUMA's product:** For PUMA

**(8) The sophistication of the relevant consumer group:** For Lopez

All told, that leaves four factors for Lopez and four for PUMA. But "[t]he application of the *Polaroid* test is not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 160 (2d Cir. 2016) (quoting *Kelly-Brown v. Winfrey*, 717 F.3d 295, 307 (2d Cir. 2013)); *Malletier v. Dooney & Bourke, Inc*., 561 F. Supp. 2d 368, 390 (S.D.N.Y. 2008) ("[T]he *Polaroid* factors cannot be balanced according to a mathematical formula.").

Considering the totality of the circumstances, Plaintiff has failed to plausibly allege that customers are likely to be confused by PUMA's mark. The marks are too dissimilar, the evidence of actual confusion is too weak and too attenuated, and the absence of any allegation of bad faith or a poor PUMA product is too pronounced to establish a federal trademark claim. Put simply, Plaintiff's use of the word "LES" as one part of a mark that arguably has acquired secondary meaning to associate its product with a geographic area does not give Lopez the right to exclude other businesses from using those same three letters in a different context to market its products. Even construed generously and in favor of Plaintiff, the allegations show no risk that consumers will be deceived into purchasing PUMA's products believing them to be Lopez's or that PUMA's use of "Les" to identify its business partner "Les Benjamins" will damage the goodwill Lopez has in LES NYC or that Plaintiff will lose control over its mark "LES NYC."

Two additional facts are significant.  First, the only overlapping word between the marks—"les"—is not independently eligible for trademark as PUMA uses it.  That is because of the "doctrine of foreign equivalents," a policy applied by courts and the USPTO, which makes "generic foreign words ineligible for private ownership as trademarks."  *Otokoyama Co. v. Wine of Japan Imp., Inc*., 175 F.3d 266, 271 (2d Cir. 1999) (internal quotation marks and citation omitted).  Second, and relatedly, it is significant that "LES BENJAMINS" is independently trademarked.  Retailers and manufacturers generally have a right—when marketing goods that have a relationship with France or French-speaking people—to use the French language article before the French language descriptor.  By trademarking "LES NYC," Lopez has not given himself the right to restrain commerce for every commercial entity using "les" as the French article.  To sum, the only linguistic similarity between the two marks—"les"—is in one context eligible for trademark protection and in the other context not.  The opposite legal status (in terms of eligibility for trademark protection) of the only overlapping word reinforces the dissimilarity between the two marks.

Count I is dismissed as against PUMA.

**B. Unregistered Trademark (Count II)**

At issue is Lopez's unregistered trademark LES™.  Section 43(a)(1)(A) of the Lanham Act protects even unregistered marks against the use of any word, term, name, symbol, or device that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . ."  15 U.S.C. § 1125(a).  "To establish a claim under this provision, a plaintiff must show that he or she has a valid mark that is entitled to protection *and* that the defendant's actions are likely to cause confusion with the

plaintiff's mark." *Gap, Inc*., 883 F. Supp. 2d at 413 (emphasis added) (citing *Morningside Grp. Ltd. v. Morningside Capital Grp., LLC*, 182 F.3d 133, 137 (2d Cir.1999)).  "An unregistered mark, such as Lopez's LES Mark, can be protected under the Lanham Act if it would qualify for registration as a trademark."  *Id*. at 414.

"To be entitled to protection, a mark must be sufficiently 'distinctive' to distinguish the registrant's goods from others."  *Id.*  A mark may either be (1) 'inherently distinctive,' where its intrinsic nature serves to identify its particular source; or (2) distinctive by virtue of having acquired a 'secondary meaning' in the minds of consumers."  *Id.*  LES™, like LES NYC®, plainly refers to the Lower East Side neighborhood of Manhattan.  It is descriptive.  Therefore, it "can be protected . . . only upon proof that through usage, [it has] become distinctive"—in other words, only upon proof that it has acquired "secondary meaning."  2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 14:1 (5th ed. 2020).

"The crucial question in a case involving secondary meaning always is whether the public is moved in any degree to buy an article because of its source."  *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc*., 696 F.3d 206, 226 (2d Cir. 2012) (quoting *Genesee Brewing Co. v. Stroh Brewing Co*., 124 F.3d 137, 143 n.4 (2d Cir. 1997)).  "Factors that are relevant in determining secondary meaning include (1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use."  *Id.* (quoting *Genesee Brewing*, 124 F.3d at 143 n.4 (internal quotation marks and citation omitted)).

"'[D]etermining whether a descriptive mark has acquired secondary meaning is a fact-intensive inquiry' that is 'ill-suited for resolution at the motion to dismiss stage.'"  *McAllister Olivarius v. Mermel*, 298 F. Supp. 3d 661, 670 (S.D.N.Y. 2018) (quoting *A.V.E.L.A., Inc. v. Estate*

*of Marilyn Monroe, LLC*, 131 F.Supp.3d 196, 212–13 (S.D.N.Y. 2015) (internal citations omitted).

"Accordingly, the question of whether a descriptive mark has acquired the secondary meaning

necessary to be distinctive generally should not . . . be resolved on a motion to dismiss." *Id.*

(quoting *A.V.E.L.A., Inc.*, 131 F.Supp.3d at 212–13 (collecting cases)).  Lopez alleges that his

LES™ mark has acquired secondary meaning on the basis that he has engaged in "continuous and

long-standing use of the mark[] in the apparel industry for nearly twenty (20) years," that products

bearing the mark have been "featured and advertised in national publications," and that others—

including several of the other defendants in this case—have attempted to plagiarize the mark. (Dkt.

No. 43 ¶¶ 31, 36, 198.)  The Court need not and does not resolve whether the LES™ mark has

acquired secondary meaning.

Assuming *arguendo* that it has, entitlement to protection does not end the unregistered

trademark infringement issue.  The LES™ mark needs to survive a likelihood-of-confusion

analysis.  *Mana Prod., Inc. v. Columbia Cosmetics Mfg., Inc*., 65 F.3d 1063, 1068 (2d Cir. 1995).

For the foregoing reasons articulated with respect to infringement of the LES NYC® mark, the

LES™ mark would not survive that analysis.  The use of LES BENJAMINS as part of PUMA x

LES BENJAMINS is not likely to be confused with LES.  Count II must be dismissed as against

PUMA.

### C. Common Law Trademark Infringement and Unfair Competition (Count III)

"[T]he standard for trademark infringement and unfair competition under the Lanham Act

is virtually identical to that under New York common law, except that the latter requires an

additional showing of bad faith."  *TechnoMarine SA v. Jacob Time, Inc*., 2012 WL 2497276, at *5

(S.D.N.Y. June 22, 2012); *see also Lopez v. BigCommerce, Inc*., 2017 WL 3278932, at *4

(S.D.N.Y. Aug. 1, 2017) (citing *id.*); *Lopez v. Bonanza.com, Inc*., 2019 WL 5199431, at *17

(S.D.N.Y. Sept. 30, 2019) (citing *id.*).  As stated above, Lopez does not make any plausible allegations of bad faith.  Further, because Lopez has failed to adequately plead his Lanham Act claims, it follows *a fortiori* that Count III cannot survive PUMA's motion to dismiss.

## III.   Unjust Enrichment (Count IV)

PUMA is correct that Lopez's unjust enrichment allegations are virtually identical to those other courts have found insufficient when he made them against other parties.  *See BigCommerce, Inc.*, 2017 WL 3278932 at *4; *Bonanza.com, Inc.*, 2019 WL 5199431, at *25.  They fail here as well.  "[T]he theory of unjust enrichment lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties."  *BigCommerce, Inc.*, 2017 WL 3278932, at *4 (quoting *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (2012) (internal quotation marks omitted)).  Lopez "does not allege any connection or relationship to [PUMA] that could have caused any reliance or inducement." *Bonanza.com, Inc.*, 2019 WL 5199431 at *17.  Count IV is dismissed as against PUMA.

CONCLUSION

For the foregoing reasons, PUMA's motion to dismiss is GRANTED. The Clerk of Court is respectfully directed to close Dkt. No. 48.

SO ORDERED.

Dated: May 19, 2020
        New York, New York

_____
            LEWIS J. LIMAN
       United States District Judge